**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DAVID TYSON, JR.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **RICHARDSON INDEPENDENT** | § | **CIVIL ACTION NO. _____** |
| **SCHOOL DISTRICT, and JEAN BONO,** | § | |
| **KIM CASTON, KAREN CLARDY,** | § | |
| **KATIE PATTERSON, ERON LINN,** | § | |
| **JUSTIN BONO, and KRISTIN KUHNE, in** | § | |
| **their official capacities,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**COMPLAINT FOR DECLARATORY AND
PERMANENT INJUNCTIVE RELIEF CONCERNING
VIOLATIONS OF SECTION 2 OF THE VOTING RIGHTS ACT**

Plaintiff David Tyson, Jr. files this Complaint for Declaratory and Permanent Injunctive Relief Concerning Violations of Section 2 of the Voting Rights Act ("Complaint") against Defendants Richardson Independent School District ("RISD"), and Jean Bono, Kim Caston, Karen Clardy, Katie Patterson, Eron Linn, Justin Bono, and Kristin Kuhne in their official capacities as members of the RISD Board of Trustees (each individually, a "Trustee" and collectively, the "Board"), as follows:

# I.

## PRELIMINARY STATEMENT

1.      The RISD Board is a body of seven members responsible for overseeing and managing a system of 54 campuses, with an annual budget exceeding $300 million, and more than 39,000 students.  Although the composition of the RISD student body has significantly diversified in recent decades, the makeup of the Board remains consistently white, affluent, and disconnected. The present RISD Board is comprised of seven white members who mostly reside in neighborhoods that are affluent, predominantly white, and at the edges of the School District.  *See* Exhibit 1 (Map of Richardson Independent School District's Boundaries and Trustee Homes).  In fact, the current composition of the RISD Board reflects only a narrow slice of RISD's community. The figurative and literal center of the District, a rich mix of races, ethnicities, and socioeconomic classes, remains unrepresented in the at-large voting system.

2.      In aggregate RISD is diverse, with white students forming less than 30% of the total student body.  However, the distribution of students among schools still tracks familiar patterns of segregation.  Tragically, there exists a distinct achievement gap between a small fraction of elementary schools that enroll predominantly affluent and white students, and the majority of elementary schools in the District that are more racially, ethnically, and socioeconomically diverse. Mr. Tyson brings this Complaint because the Board plainly and consistently prioritizes this cluster of high-performing, primarily white schools at the expense of the rest of the community.  The purpose underlying locally controlled independent school districts is to empower the entire community.  In short, the present at-large election system denies equal voting opportunity to most of the parents of children enrolled in RISD schools.

3.      Like many urban and inner-ring suburban school districts, RISD has experienced dramatic student demographic changes in recent decades.  In 1970, when RISD was first placed

under a federal desegregation order, the racial composition of the RISD student body was more than 95% white, only 3.3% black, and less than 1% Hispanic. Today, RISD is "majority-minority" with Hispanic/Latino, Black/African American, Asian, and other non-white students comprising more than 70% of the RISD student body. Additionally, more than half of RISD's students are classified as economically disadvantaged.

4.      As RISD grapples with its history of segregation, it also faces pressing issues of poverty, inequality, discrimination, and overt racism in its schools. On paper, the RISD Board is responsible for ensuring that the District's resources are applied to meet the interests of every child within the District's boundaries. Elected officials responsible for the oversight, finance, and management of public school systems hold critical positions in representative government. Trustees are supposed to make decisions involving the allocation of resources in a manner that benefits all children equally – no matter the neighborhoods in which they are located. Unfortunately, the RISD Board's fiscal and policy decisions contribute to an egregious performance gap between affluent, white students attending favored schools and everyone else. Mr. Tyson understands firsthand that the composition of the Board determines which voices are heard and whose interests are protected and prioritized.

5.      The impact of this perpetually monolithic Board is best measured by the inequality that exists among the District's 40 elementary schools. In 2017, there were only eight elementary schools in the District where 70% or more of students met grade level in two or more subjects across all grades tested on "STAAR" (State of Texas Assessments of Academic Readiness) exams. These eight schools have student bodies that are more than two-thirds white and in which fewer than 17% of students are classified as economically disadvantaged. Meanwhile, at the eight lowest-performing elementary schools on the same metric, the students enrolled are predominantly

Latino and African-American, economically disadvantaged and more likely to be English Language Learners ("ELL"). At the highest-performing school, Prairie Creek Elementary School, which is predominantly white and affluent, about 84% of students met grade level in two or more subjects, and at the lowest-performing school based on this measure, Carolyn G. Bukhair Elementary School, in which students are mostly Latino, low-income, and ELL, only 21% of students meet the same standard. The story of RISD is a tale of two school districts where a greater than 60 percentage point achievement gap exists between campuses at opposite ends of the academic spectrum. Such disparity between schools in the same district is not inevitable. Conscious decisions, made by elected officials, are needed to improve conditions across the vast majority of RISD. Clearly, the present Board is failing the children of RISD. Now more than ever, the District needs a Board which reflects the composition of the community it serves.

6.      However, that is unlikely to occur given the current electoral system. Under the current at-large election system, all voters within RISD are permitted to vote on the candidates for every Board seat. Trustees serve three-year terms in positions called "places" – which, ironically, have no geographic significance. In other words, elected Trustees do not represent any specific territory or sub-district within RISD. This discriminatory voting system is a relic of the District's segregated past and must be left there. Across the country and even the Dallas metro area, school districts with at-large election systems have recognized, either voluntarily or through judicial intervention, the inherent representational flaws in their voting structure and have switched to single-member district systems. Under single-member district elections, board seats are tethered to specific geographic subsections of the school district. A single-member district system vests trustees with responsibility for the interests of actual communities, ensuring that all parts of the District participate in the Board's decision-making process.

7.      The at-large system discourages minority or minority preferred candidates from seeking office because it effectively functions as a white-controlled referendum on all candidates. Although white students in RISD schools made up only 29.7% of the student body during the 2016-17 school year, white voters comprise approximately 62.5% of RISD's Citizen Voting Age Population ("CVAP"). Whether this mismatch is more influenced by demographic factors such as age or the concentration of school-aged children attending private schools, the effect is that a bloc of white voters controls all seven Trustee positions and sets District policy without the input of and participation from those communities from which the vast majority of the students come. Taken together, the chilling effects of the at-large system and the obvious polarization of the white voters, the current Board fails to reflect the composition of the real stakeholders of the public-school system.

8.      Mr. Tyson served RISD as a two-term Trustee and has three children who attended and graduated from RISD schools. As a member of the community and a concerned citizen, he is passionately invested in the future of RISD's schools and children. Having experienced the decision-making process of the Board firsthand, Mr. Tyson is well-situated to bring this lawsuit and pursue a switch to single-member districts to ensure fair and balanced representation.

9.      Mr. Tyson has been told by RISD leadership that the District will not transition to single-member district elections and seeks judicial relief for violations of the Voting Rights Act of 1965 (the "Voting Rights Act"). Specifically, Mr. Tyson requests that the Court issue a permanent injunction and declaratory judgment declaring the current at-large system a violation of federal law. Such a ruling will ensure that Mr. Tyson's voice and the voices of the community are heard and factor into the decisions affecting the fate of the RISD's children.

## II.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to: (1) 28 U.S.C. § 1331, which grants United States district courts original jurisdiction over any civil action "arising under the . . . laws . . . of the United States[,]" (2) 28 U.S.C. § 1343(a)(3), which grants district courts original jurisdiction over any civil action to redress a deprivation of any right secured by a law of the United States "providing for the equal rights of citizens within the jurisdiction of the United States[,]" and (3) 28 U.S.C. § 1343(a)(4), which grants district courts original jurisdiction over any civil action under "any Act of Congress providing for the protection of civil rights, including the right to vote."

11.    This Court has personal jurisdiction over RISD because the District is located within Dallas County, Texas.  This Court also has personal jurisdiction over the Trustees because each resides in Richardson or Dallas, and all reside within the territorial boundaries of RISD.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because all Defendants reside in the State of Texas and all reside within the Northern District.

## III.

## PARTIES

A.    **Plaintiff**

13.    Mr. Tyson is a United States citizen, an African American, an entrepreneur, and a registered voter who has resided within the boundaries of RISD since 1981.  Mr. Tyson is also an active member of his community and a successful business owner.  Mr. Tyson helped found the Lake Highlands Chamber of Commerce and was a member of The Exchange Club of Lake Highlands.  In 2007, Mr. Tyson founded Sales Trac Coaching and Management Development, Inc., a leadership development and performance management corporation.

14.    Mr. Tyson holds a deep and committed interest in the success and equality of RISD schools.  All three of Mr. Tyson's children graduated from RISD public schools, the youngest in 2004.  In 2004, Mr. Tyson ran for the RISD Board, a difficult decision knowing that his race would guide the decisions of most voters within RISD.  Mr. Tyson was unopposed for the seat.  Mr. Tyson held that position for two terms, retiring in 2010.  No other person of color has ever held a seat on the RISD Board of Trustees.

15.    During his tenure on the Board, Mr. Tyson advocated for the interests of minority and low-income students in RISD.  This advocacy included lobbying fellow Trustees to hire a search firm capable of vetting qualified minority candidates for leadership positions within the District, including for a superintendent opening in 2010.  The Board summarily rejected Mr. Tyson's recommendation and instead selected Kay Waggoner, the white superintendent from Grapevine-Colleyville Independent School District, a more affluent suburban school district, as the lone finalist for the position.  After Waggoner stepped down, the Board promoted Waggoner's deputy superintendent, Jeannie Stone, to superintendent in late 2016.  A review of Board meeting minutes after the most recent superintendent vacancy reveals that RISD never publicly considered qualified minority candidates for the position. RISD's failure to even *consider* qualified minority candidates for superintendent, especially considering the District's majority-minority composition and demographic trends, is unacceptable.  Maintaining the status quo at the highest levels of power keeps RISD frozen in time, lacks true democratic legitimacy, and inhibits the development of tools necessary to address the challenges of inequality and poverty that many of its students face daily.

16.    It is important to Mr. Tyson that the District take into consideration the needs and concerns of the minority students and parents in RISD.  Mr. Tyson resides in a neighborhood served by Audelia Creek Elementary School, where 80.5% of children enrolled were economically

disadvantaged and 94.8% were non-white in 2016-17.  Additionally, only 24% of the school's students met grade level requirements in two or more subjects on the state STAAR exams in 2017. Without representation on the Board, the children from Audelia Creek and similar RISD schools will remain without trustees with a vital stake in the neighborhood to represent them when important decisions are made. Instead, all such decisions will continue to be made by trustees who reside in very different neighborhoods with different interests.  Mr. Tyson knows that the at-large system leaves the needs and concerns of the vast majority of the children of RISD unaddressed. The current electoral process denies Mr. Tyson and other African Americans, Latinos, Asians, and other minorities an equal opportunity to elect representatives of their choice.  Mr. Tyson knows that the transition from at-large voting to a single-member district scheme will enable minorities to run for Trustee positions, inspire greater electoral participation, and lead to a more equitable system of representation.

## B.    Defendants

17.    RISD is an Independent School District located in Dallas County and created pursuant to Texas law.  RISD may be served with process through its Superintendent, Dr. Jeannie Stone, at 400 South Greenville Avenue, Richardson, Texas 75081.

18.    Jean Krone Bono is a Trustee elected to Place 1 of the Board and resides within RISD.  She may be served with process at 9222 Arbor Branch Drive, Dallas, Texas 75243.

19.    Kim Caston is a Trustee elected to Place 2 of the Board and resides within RISD. She may be served with process at 7618 Carta Valley Court, Dallas, Texas 75243.

20.    Karen Clardy is a Trustee elected to Place 3 of the Board and resides within RISD. She may be served with process at 9314 Bill Browne Lane, Dallas, Texas 75243.

21.    Katie Patterson is a Trustee elected to Place 4 of the Board, is the Secretary of the Board, and resides within RISD.  She may be served with process at 6428 Barkwood Lane, Dallas, Texas 75248.

22.    Eron Linn is a Trustee elected to Place 5 of the Board and resides within RISD.  He may be served with process at 1801 Longmont Place, Richardson, Texas 75081.

23.    Justin Bono is a Trustee elected to Place 6 of the Board, is the President of the Board, and resides within RISD.  He may be served with process at 9219 Arbor Trail Drive, Dallas, Texas 75243.

24.    Kristin Kuhne is a Trustee elected to Place 7 of the Board, is the Vice President of the Board, and resides within RISD.  She may be served with process at 1114 Grassmere Drive, Richardson, Texas 75080.

25.    All the trustees live within affluent, predominantly white neighborhoods in the cities of Dallas and Richardson.  *See* Exhibit 1.  In fact, most trustees live in residences worth twice the market value of the average home in RISD – isolated physically and socially from most of the community they are elected to serve.  Three trustees (Karen Clardy, Jean Bono, and Justin Bono) live within less than a half-mile radius of one another in the Lake Highlands neighborhood of Dallas.  A single-member district electoral scheme would not allow such a concentration of power.  Protective of their own self-interests, the incumbent Trustees have denied the community a more equitable and progressive electoral system, prompting the need for judicial intervention.

## IV.

## FACTS

### A.    The Richardson Independent School District

26.    RISD is located within Dallas County and contains most of the City of Richardson and portions of the Cities of Dallas and Garland.  RISD, founded in 1854, has an enrollment of

over 39,000 students housed across 54 campuses.  The District's operating budget for 2016-2017 was $303,089,428.

27.     RISD is a growing and diverse school district.  According to the Texas Education Agency ("TEA"), in the 2016-2017 school year the student population was 21.1% African American, 38.8% Latino, 29.7% white, 7.1% Asian, and the remainder were students of diverse backgrounds.  About 25.8% of RISD students are designated English Language Learners and 54.2% are "Economically Disadvantaged."

**B.     RISD Remains Segregated by Race and Educational Outcome**

28.     From 1970 to 2013, RISD operated under a federally mandated desegregation order, put in place to rebalance the unequal and stratified school system created by the District's longstanding operation under legally sanctioned segregation.  In 2009, the RISD Board voted to allow the District to pursue a "unitary status" ruling, which would lift the federal desegregation order.  Although RISD's move to lift the desegregation order was opposed by the U.S. Department of Justice's Civil Rights Division, unitary status was achieved on July 23, 2013.

29.     On superficial District-wide metrics alone, RISD appears to be a racially, ethnically and socioeconomically diverse and integrated school district.  However, a closer look at RISD elementary schools shows a pattern of division, where many white students attend schools that are predominantly white and affluent.  These white students are separated from the majority of RISD students who are low-income and Hispanic, African American, Asian, mixed race, and of other backgrounds.  School performance heavily correlates with poverty, and the predominantly affluent white schools outperform others in the District.

30.     The eight highest performing elementary schools in RISD as measured by the percentage of students meeting grade level in two or more subjects tested by the STAAR exams are also the eight whitest elementary schools.  All eight have student enrollments that are more

than 70% white and in which fewer than 17% of students were classified as economically disadvantaged. The eight lowest performing elementary schools are attended by a majority of Latino, African American, and Asian students with very low white enrollment (13% or lower) and where more than 80% or more of students are economically disadvantaged. The difference in the highest performing and lowest performing schools is stark, between 72% and 84% of students at the highest performing schools meet STAAR grade level requirements in two or more test subjects, while only 21% to 34% of students at the eight lowest performing schools meet the same metric.

31.    Incredibly, five of the seven white Trustees on the RISD Board reside within school attendance zones for the eight predominantly affluent, racially identifiable white elementary schools. The remaining two Trustees reside within attendance areas that are 45.5% white in enrollment – a percentage that is still much higher than the District average. This power structure leaves large swaths of the district politically voiceless. Because of this broken and discriminatory election system, Trustees who reside in predominantly white and affluent neighborhoods wield disproportionate power in determining the fates of a school district comprised of mostly low-income and non-white students.

32.    Common to Latino, African American, and Asian students in RISD is the urgent need for the District to devote more resources to assist these students to achieve academic success. In RISD, there exists a double-digit achievement gap, as measured by STAAR testing, between white RISD students and Hispanic, African American, and Asian RISD students in many subjects. An achievement gap persists through every level of the RISD student experience. In fact, the gap first appears at Grade Level 3, the first level at which STAAR testing is administered. For Grade 3 reading in 2017, the percentage of RISD students approaching grade level or above was 90% for white students, 81% for Asian students, 65% for Hispanic students, and 64% for African American

students. The gap continues as students move through the system. Across all grades, in 2017, the reported rate of students at meets grade level in reading was 80% for white students, 70% for Asian students, 42% for Hispanic students, and 39% for African American students.

33.    Similar struggles exist for ELL students. A review of the Class of 2016 four-year longitudinal graduation rate reveals RISD's ELL students graduated at a far lower rate than the state average (61.2% in RISD compared to 71.3% of ELL students statewide). The District's ELL students are behind state averages across many grade levels and subject areas.

34.    White students in RISD outperform white students statewide on the percentage of students that meet grade level in two or more subjects, at 81% in 2017 – 20 percentage points higher than the stage average. RISD's disparate structure allows white students to outpace their non-white peers by a larger margin than exists statewide. Educators know that this gap is not inevitable and is remediable. In fact, RISD's own "2017-18 Equity Plan" concluded that its "schools with high concentrations of students living in poverty and minority students" have higher concentrations of "inexperienced" and "ineffective teachers." Of course, the actual motivation for greater equity throughout RISD is absent given its present political process.

35.    RISD needs strong guidance from members of its community to address the complex issues caused by overcrowding, gentrification, and lingering patterns of segregation. Control must be vested in the community through single-member district voting, allowing representatives from across RISD, not isolated pockets, to find solutions.

C.    **The Discriminatory Effects of RISD's Electoral System Upon Minority Voters**

36.    The CVAP total of RISD is 168,040 persons. African Americans comprise 17.9% of RISD's CVAP, Latinos comprise 11.2%, and Asians comprise 6.6%. In a district with seven Board of Trustee seats, one would expect an African American, Latino, or Asian to be elected as a Trustee. However, the at-large system of voting discourages African American, Latino, Asian,

and other minority preferred candidates from running, because potential candidates know that they have no likelihood of winning. Minority preferred candidates face a white voting bloc, representing more than 60% of the eligible CVAP, able to bar such candidates from every seat in the District. The control white voters wield over elected positions in government is compounded by issues such as low voter turnout and lack of a federal or state election holiday. Voting in RISD is racially polarized. White voters vote as a distinct bloc, resulting in the defeat of minority preferred candidates for Board seats. African Americans, Latinos, and Asians within RISD are also a "politically unified group," which votes cohesively as a bloc when compared against white voters. The racial polarization leads to limited representation of, and ultimately, to indifference to, the interests of the non-white community in RISD.

37. The African American population in RISD is geographically compact, with a significant presence in the historically black Dallas neighborhood of Hamilton Park. African Americans could constitute a majority of eligible voters in at least one properly-apportioned single-member electoral district. If African American, Latino, and Asian eligible voters are considered together, they would constitute a majority of eligible voters in *two or more* properly apportioned single-member electoral districts.

38. African Americans within RISD share similar socioeconomic characteristics and have undergone a history of challenges. They have been subjected to official and private discrimination on the basis of race in, among other things, employment, education, health services, and housing. Those acts of discrimination exacerbate the vote dilution caused by the RISD electoral system. Historical discrimination against African Americans in education, housing, employment, and health services has contributed to present conditions in RISD. In fact, the origins of Hamilton Park are intertwined with a racist past. The neighborhood was founded in the 1950s

as an African American community after bombings of homes and racialized use of eminent domain drove African Americans from other parts of the City.

39.     Latinos in RISD have also faced a parallel history of public and private discrimination on the basis of race and/or ethnicity in employment, education, health services, and housing.  Historical discrimination against Latinos has contributed to a lower socioeconomic status, and forms of discrimination and racism against Latinos exist to this day.  These acts, along with the vote dilution created by the RISD electoral system, prevent Latinos from political participation on equal footing with white residents of RISD.

40.     Adequate Latino representation in elected bodies is more important than ever given the significant Latino population in RISD.  TEA data shows that between the 2001-2002 and 2016-2017 school years, RISD's Latino student population more than doubled from 7,284 students to 15,216 students. Latino students surpassed white students as the largest ethnic/racial student group in 2007-2008.  Unfortunately, but not surprisingly given the composition of the Board and the District's leadership, teacher hiring practices in RISD have not mirrored this trend.  The percentage of Hispanic teachers in RISD is only 13.6%, while the total percentage of Hispanic teachers statewide is 26.6%.

41.     Asians in Texas have faced similar historical discrimination, both publicly sanctioned and privately expressed.  Historical inequality, and historical norms permitting racism against Asians, have led to a modern-day society still entrenched in inequality and discriminatory structures.

42.     Overt racism in RISD continues to this day.  This past fall, *The Dallas Morning News* reported that racist memes were circulated before a football game between two RISD high schools, Richardson High School and J.J. Pearce.  Richardson High School's student body is

17.9% black and 26.1% white, while J.J. Pearce is only 6.8% black and 43.7% white.  The memes included images of a Ku Klux Klan member, adorned with the J.J. Pearce logo, burning the Richardson High School logo, as well as the image of a slave being whipped.  A disparate system, with ingrained structural racism, cannot fix itself.  African American, Latino, and Asian students deserve better, and Mr. Tyson petitions this Court to address the ongoing federal violations.

43.    Thus, the legacy of the RISD electoral system is one wherein inhibited political participation impairs the success of African American, Latino, and Asian students.  Specific mechanisms contributing to this problem include: (1) at-large elections for all seven seats on the Board; (2) staggered election terms; and (3) a District-wide plurality vote requirement.  There is no legitimate reason to continue along this path.  The time is long overdue for RISD to adopt a system that ensures that the African American, Latino, Asian, and other communities have meaningful opportunity for full and fair participation in the election process.

**D.    Absent Judicial Intervention, The Current Discriminatory Electoral System Will Remain In Place**

44.    Although "at-large . . . districting schemes are not per se unconstitutional . . . where the petitioner can demonstrate that 'its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice,' . . . such districting schemes are constitutionally infirm."  *Zimmer v. McKeithen*, 485 F.2d 1297, 1304-05 (5th Cir. 1973) (internal citations omitted).

45.    The RISD electoral system violates Section 2 of the Voting Rights Act.  Unless the Court directs RISD to design a single-member district electoral system that does not unlawfully dilute the votes of African American, Latino, and Asian voters, the current discriminatory system will persist.  Mr. Tyson is the only minority to ever successfully run for a Board seat in RISD. Although Mr. Tyson has publicly and privately encouraged African Americans and other minority

groups to seek a Board seat, they do not do so – dispirited by an archaic and unconstitutional electoral system that ensures they cannot succeed.

## V.

## CLAIMS

**A.    Count 1:  Declaratory Relief For Violations Of Section 2 Of The Voting Rights Act**

46.    The allegations set forth in paragraphs 1-45 above are hereby incorporated as if fully set forth herein.

47.    Section 2 of the Voting Rights Act prohibits any standard, practice or procedure that results in the denial or abridgment of minority voting rights.  Specifically, it forbids any electoral system that denies African Americans, Latinos, Asians, and other minority groups an opportunity equal to that afforded to other members of the electorate to elect representatives of their choice.

48.    RISD's at-large electoral system for electing its Board dilutes African American, Asian, and Latino voting strength and is not equally open to participation by RISD's non-white voters.  Further, the electoral system results in African Americans, Asians, and Latinos having less opportunity than other RISD voters to meaningfully participate in the electoral process and to elect representatives of their choice.

49.    The African American community in RISD is sufficiently large and geographically compact, and constitutes a politically unified group that votes cohesively as a bloc, such that one or more properly-apportioned single-member electoral districts can be drawn in which African Americans would constitute a majority of eligible voters.  If African American, Latino, and Asian eligible voters are considered together, they would constitute a majority of eligible voters in two or more properly apportioned single-member electoral districts.

50.     RISD Board elections are characterized by racially-polarized voting in which the predominately white voting bloc votes in a way that regularly defeats the African American, Latino, Asian, and non-white communities' candidates of choice and has a chilling and discouraging impact on minority voter participation.  Thus, based on the totality of past and present circumstances, the RISD electoral system impermissibly dilutes the minority vote and stymies that community's ability to participate fully in the election process.

51.     Accordingly, Mr. Tyson requests that the Court issue a declaratory judgment that the RISD electoral system violates Section 2 of the Voting Rights Act.

**B.     Count 2:  Injunctive Relief For Violations Of The Voting Rights Act**

52.     The allegations set forth in paragraphs 1-51 above are hereby incorporated as if fully set forth herein.

53.     Unless enjoined, the RISD electoral system will remain in force and, therefore, RISD will continue to violate Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for Board members utilizing that unlawful system.

54.     Without the Court's intervention, the Board's actions and the electoral system will cause African American, Latino, and other non-white voters irreparable harm because the electoral system denies those voters the opportunity to fully participate in the electoral process by diluting the strength of their vote, for which there is no adequate remedy at law.

55.     Accordingly, Mr. Tyson requests that the Court enter a permanent injunction prohibiting Defendants from administering, implementing, and conducting future elections for the RISD Board based on the at-large electoral system.  Such relief is authorized by the Voting Rights Act as well as principles of equity.

C.    **Count 3:  Request For Attorneys' Fees**

56.    The allegations set forth in paragraphs 1-55 above are hereby incorporated as if fully set forth herein.

57.    Because of RISD's unlawful electoral system, Mr. Tyson has been required to retain the undersigned counsel to present and prosecute the claims asserted herein.

58.    This action is a suit to enforce the voting guarantees of the Voting Rights Act. Pursuant to 52 U.S.C § 10310(e) and 42 U.S.C. § 1988, Mr. Tyson is entitled to recover his reasonable attorneys' fees, reasonable expert fees, and other reasonable litigation expenses as part of his costs for pursuing this lawsuit.

## VI.

## REQUEST FOR RELIEF

In light of the foregoing, Mr. Tyson respectfully requests that this Court enter judgment in his favor and against all Defendants, providing for the following relief:

(a)    A judicial declaration that the at-large method for electing members to the RISD Board violates Section 2 of the Voting Rights Act;

(b)    A permanent injunction prohibiting RISD, its Trustees, agents, and all persons acting in concert with any of them, from administering, implementing, or conducting any future elections for the Board under an at-large electoral system;

(c)    A writ temporarily enjoining the May 5, 2018 Board election from proceeding until the legality of RISD's electoral system may be adjudicated;

(d)    An order directing RISD to devise an election plan and an implementation schedule that remedies the violations of Section 2.  If RISD fails to formulate such a plan, the Court should order into effect a new election plan

of its own, designed to remedy the violations of Section 2, and order elections to be held pursuant to that plan as promptly as possible;

(e)    An award of reasonable attorneys' fees, reasonable expert fees, and other reasonable litigation expenses pursuant to 52 U.S.C § 10310(e), 42 U.S.C. § 1988, and any other applicable statute;

(f)    An award of costs of Court; and

(g)    Any other relief, at law or in equity, to which Mr. Tyson is entitled and which this Court deems just and proper.

DATED:  January 26, 2018.                    Respectfully submitted,


                                        **BREWER STOREFRONT, PLLC**


                                        By: */s/ William A. Brewer III*
                                            William A. Brewer III
                                            State Bar No. 02967035
                                            1717 Main Street
                                            Suite 5900
                                            Dallas, Texas 75201
                                            Telephone: (214) 653-4000
                                            Facsimile: (214) 653-1015

                                        **ATTORNEY FOR PLAINTIFF**

# Exhibit 1



**Map of Richardson Independent School District's Boundaries and Trustee Homes**